# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

STERLING INSURANCE COMPANY v. COMMONWEALTH OF VIRGINIA.

GEORGE D. COFFEY, JR. v. COMMONWEALTH OF VIRGINIA.

November 30, 1953.

Record ·Nos. 4097, 4099.

Present, All the· Justices.

The opinion states the case.

*Meyers & Matthias; Shewmake, Gary, Goddin & Blackwell* and *May, May & Garrett,* for appellant, Sterling Insurance Company.

*Rooke & Merhige,* for appellant, George D. Coffey, Jr.

*J. Lindsay Almond, Jr., Attorney General* and *C. F. Hicks, Assistant Attorney General,* for the Commonwealth.

WHITTLE, J., delivered the opinion of the court.

FROM THE STATE CORPORATION COMMISSION

These cases, by agreement, were heard together. That of the Sterling Insurance Company is before us upon an appeal from an order of the State Corporation Commission which revoked Sterling's license to do business in Virginia. George D. Coffey, Jr. has appealed from an order of the Commission revoking all licenses authorizing him to act as agent for insurance companies in Virginia.

The above orders were entered on July 28, 1952, by a majority vote of the three commissioners, Commissioner Catterall dissenting. A third case against Charles R. White resulted in an order revoking his license to sell insurance. This order was entered by the unanimous vote of the Commission and White did not appeal.

The facts of the cases may be stated thus: In August, 1950, Katherine B. Nicholas secured a health and accident policy from Guarantee Reserve Life Insurance Company. Coffey at the time was acting as agent for Guarantee, and White, as his sub-agent, sold the policy to Miss Nicholas. When Miss Nicholas applied for the policy she was suffering from a cataract on her eye and this fact was disclosed to White. In April, 1951, Coffey left his employment with Guarantee Reserve Life Insurance Company and became State Manager for the Sterling Insurance Company. White continued to

work under Coffey and was licensed by the Commissioner as a solicitor for Sterling.

In April, 1951, White persuaded Miss Nicholas to surrender her Guarantee Reserve policy and take out a policy with Sterling. In the written application for the Sterling policy she did not disclose the trouble with her eye and affirmatively stated that she had not received medical advice within five years. White knew that the statement in the application was false. He informed Miss Nicholas that she need not disclose her ailment in the application.

Nine months after she had taken out the policy with Sterling Miss Nicholas had an operation for the cataract condition. She filed claim with Sterling for benefits and the company refused payment, because of the misrepresentation in the application.

When Sterling refused to pay Miss Nicholas' claim she filed a complaint with the Insurance Department of the Commonwealth. On the basis of Miss Nicholas' statements to the Insurance Department summonses were issued against White, Coffey, and the Sterling Insurance Company, and a hearing was held before the State Corporation Commission, resulting in the orders above referred to.

The summons against Sterling Insurance Company charged a violation of § 38-130, Code of Virginia, 1950, in that the company, "a foreign corporation * * * has issued or circulated, or caused or permitted with its knowledge and consent to be issued or circulated, statements misrepresenting the terms of policies of insurance issued by it and of the benefits and advantages permitted by its policies, and that such corporation has made, or permitted to be made, misleading representations and incomplete comparisons of its policies to Katherine B. Nicholas, for the purpose of inducing or tending to induce the said Katherine B. Nicholas to exchange policies held by her in other companies for policies in the said Sterling Insurance Company."

This summons was issued pursuant to § 38-131 of the Code of Virginia, and commanded Sterling to show cause

why its license to transact business in the State should not be revoked.

The summons against Coffey charged that he "has, in soliciting and issuing a policy of insurance to Katherine B. Nicholas, been guilty of twisting the contracts of other companies, of misrepresenting the provisions of the contract he was selling, and of fraudulent or dishonest practices, contrary to the insurance laws of this State, including the provisions of section 38-84 of the Code of Virginia, 1950."

Appellants filed four assignments of error but in our view of the cases it will be necessary for us to discuss only one, *i.e.*, that the Commission's findings were not supported by the evidence and were contrary to law.

In considering this assignment we must be mindful that the issue here involved is not between Miss Nicholas and the insurance company but rather between the company, one of its agents, and the Commonwealth. It is neither a civil suit nor a criminal prosecution. Modern statutes require many persons engaged in trades and professions to secure licenses from the State. The object of these statutes is to protect the public from the dangers of incompetency and fraud. As the requirement for a license is to protect the public, so is the reason behind its revocation. The strict rules of criminal procedure do not apply in such cases, and the charges do not have to be proven beyond a reasonable doubt. *Campbell* v. *District Committee, etc.*, 179 Va. 244, 18 S. E. (2d) 883.

It is admitted that any misrepresentations made were made by White and that Sterling's only contact with White was through Coffey. Therefore we have to look first to see if Coffey, through his relations with White, is guilty of such conduct as would warrant the revocation of his license. Manifestly, if Coffey is not guilty, Sterling cannot be.

Section 38-84, dealing with misrepresentation and twisting by agents, and section 38-130, dealing with misrepresentation by insurance companies, were passed to correct the same evil: namely, misleading representations or incom-

plete comparisons of policies made to insured persons or prospects for insurance in order to induce them to take or switch contracts of insurance. The "twisting" referred to in section 38-84 contemplates misrepresentation or misstatement of facts or incomplete comparisons of policies to induce an insured to give up a policy of insurance in one company for the purpose of taking insurance in another. See *Brandt* v. *Beha*, 216 N. Y. S. 178, 217 App. Div. 644.

The Commonwealth conceded in argument at bar that where an agent leaves one company and goes with another, attempting to carry his customers with him, he has violated no law unless the policyholders are induced to leave their former company through false representations made by such agent. We find that Coffey was not guilty of or responsible for any such representations.

As said by Commissioner Catterall in his dissenting opinion:

"When Coffey transferred from the Guarantee Reserve to the Sterling he evidently wanted to take his customers with him. Since health policies contain a 'waiting period' before the insured is covered, a person insured in the old company would be unwilling to transfer to the new unless the new company agreed to waive the waiting period. Coffey obtained from Sterling authority to waive the waiting period in certain cases. Coffey's testimony on that point was:

" 'Q. When did you leave Guarantee Reserve and go with Sterling? A. The spring of 1951; I can't remember the exact date.

" 'Q. Did Mr. White come with you at that time? A. Yes he did.

" 'Q. Now, Mr. Coffey, there has been some testimony here by Mr. White to the effect that some policies written by Sterling were to be I.B'd. That means immediate benefit, does it not? A. That is correct.

" 'Q. Tell the Commission exactly what you told Mr.

White. A. I was informed by the Home Office of Sterling that should any policyholder of any other company, no particular company in mind so far as I knew, that if they had like benefits on a loss of time policy and out of their own choice they would prefer to have coverage with Sterling, that they would issue what we commonly call 'I. B.', which with respect to their preceding policy would not constitute a loss of time if they had to be benefited. That all applied to like benefits and subject to the conditions that they were benefitable. In other words, Sterling did not want to buy any other company's claims.

" 'Q. Is that the gist of what you informed Mr. White? A. Yes, it was.

" 'Q. What were the agents to do with respect to the policyholders that wanted the I. B. feature? A. Agents were required to submit with the application information that would establish that they were like insured with a company with like benefits and in force and that was to accompany the application and be forwarded to the Home Office.

" 'Q. In what form was that to be handed you, in writing? A. It had to be in writing, otherwise, no one would know about it.

" 'Q. Did you know anything about Miss Nicholas' application? A. No, sir, I have never seen it.'

"It is reasonable to infer that Coffey instructed White and his other solicitors to solicit policyholders to change their policies from Guarantee Reserve to Sterling, but if Coffey did not tell White to make misrepresentations he is not answerable for White's misrepresentations.

"There is no evidence that Coffey saw the application made by Miss Nicholas to Sterling. Coffey testified that he did not see it and nobody testified that he did. Even if he had seen it, there is no clear evidence that he would have known that the statement signed by Miss Nicholas was untrue.

"White testified:

"Commissioner Catterall:

" 'Q. Did you tell Mr. Coffey about the cataract this lady had? A. It was told about the cataract on the Reserve contract, but I can't say I told him about this cataract, because I don't recall whether I told him or not because I was told to I. B. any of them that had contracts in force with the Guarantee Reserve and it was issued on the contract of the Guarantee Reserve, and on which George D. Coffey had given me instructions and I was sent out with those instructions and it appears to me that, after I got all my contracts changed to Sterling where he had told me to I. B. them and I was out of town the remainder of the time, South Hill and places like that.

" 'Q. If you can give me a short answer to this question, I would like for you to do so. Did you ever tell Mr. George D. Coffey that this lady had a cataract? A. With the Guarantee Reserve policy, yes.

" 'By Mr. Matthias:

" 'Q. With the Sterling policy? A. I could not issue a true statement that I told him on that but he knew it when it was on the Guarantee policy.'

"I cannot regard that as clear evidence that Coffey knew about the cataract. White's effort was to exculpate himself by pinning full responsibility on Coffey; but White did not testify that he had mentioned the cataract to Coffey. He says it was 'on' the Guarantee Reserve policy, but there is no evidence that Coffey saw such a statement on the Guarantee Reserve policy. * * * So far as I can find from the evidence, Coffey did not misrepresent anything to Miss Nicholas and did not misrepresent anything to Sterling.

"If Coffey had been guilty of misconduct, and if his misconduct had been authorized or directed or ratified or approved by senior company officials, I would approve of revoking the company's license to do business in Virginia. Since I find that Coffey was not guilty of misconduct, I necessarily find that the company was not guilty."

The majority opinion of the Commission contains conclusions which are not borne out by the evidence or reasonable deductions therefrom. Circumstantial evidence may be considered in cases of this kind but there must exist circumstances upon which to base the conclusions. The result reached in the Commission's order inflicts serious detriment upon these appellants which should not be permitted without requiring that their misconduct be established by reasonably clear proof.

We are in accord with the views expressed by Commissioner Catterall in his dissenting opinion heretofore quoted as well as the conclusions reached by him as follows:

"Section 38-84 of the Code provides that the Commission may revoke the license of any agent who is found guilty of an offense described in the statute as 'twisting the contracts of other companies.'

" 'Twisting' is a word used in the insurance business to describe the conduct of an agent who persuades a prospect to drop a policy in one company and take out a policy in the agent's company. The word came into use in connection with life insurance; but, as used in the statute, it appears to refer to all kinds of insurance.

"Coffey did not make or authorize any misrepresentation but he did authorize White to encourage policyholders to transfer from Guarantee Reserve to Sterling. The word 'twisting' is sometimes used to mean merely persuading a policyholder to change companies, but it is more often used to mean persuading a policyholder to change companies by means of false representations.

"Webster's Dictionary defines the verb 'twist' as follows:

" '6. *Life Insurance.* To induce (a person), esp. by misrepresentation or trickery, to drop a policy already in force in a company other than that of the twisting agent for one in the agent's company.'

"Black's Law Dictionary defines 'twisting':

" 'Colloquially, in insurance, the misrepresentation or misstatements of fact or incomplete comparison of policies to

induce the insured to give up a policy in one company for the purpose of taking insurance in another.'

"My conclusion of law is that the offense of 'twisting' involves misrepresentation, and I find as a fact that Coffey was not guilty of twisting."

For the reasons here expressed we reverse the orders of the State Corporation Commission and reinstate the licenses of the appellants.

*Reversed.*